# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

| | |
|---|---|
| In the matter of:  )  <br> ) <br> KURT E. GRAHAM ) <br> (Chapter 12 Case <u>07-40427</u>) ) <br> ) <br> *Debtor* ) <br> ) <br> ) <br> ) <br> KURT E. GRAHAM ) <br> ) <br> *Plaintiff* ) <br> ) <br> v. ) <br> ) <br> CAREY GRAHAM ) <br> ) <br> *Defendant* ) | Adversary Proceeding <br><br> Number <u>07-4124</u> <br><br><br> **FILED** <br> Samuel L. Kay, Clerk <br> United States Bankruptcy Court <br> Savannah, Georgia <br> By lbarnard at 2:48 pm, Jan 26, 2009 |

### MEMORANDUM AND ORDER

Debtor's Chapter 12 was filed on March 22, 2007. The Meeting of Creditors held pursuant to 11 U.S.C. § 341 was conducted on April 25, 2007. At the time of filing, Debtor contended that he was the holder of a lease over Farm Number 791 in Effingham County, Georgia, sometimes referred to as the "Turf Farm." The real estate located on the Turf Farm is family property formerly owned by Debtor's grandmother and now owned in three undivided shares by his father, Ralph Graham (hereinafter referred to as "Ralph"), his aunt, Julie Weddle (hereinafter referred to as "Julie"), and his uncle, Carey

Graham (hereinafter referred to as "Carey"). Debtor entered into a lease for the Turf Farm with Carey, Ralph and Julie in 2004. Carey's son, Loy Graham (hereinafter referred to as "Loy"), has an interest in farming some of the property located on the Turf Farm, and at some previous time, approximately 55 acres of land, identified as Tracts H and G, was carved out for Loy to conduct farming operations on. *See* <u>2004 Lease Agreement</u>, Exhibit D-9; <u>2005 Lease Agreement</u>, Exhibit D-11; <u>2006 Lease Agreement</u>, Exhibit D-13.

The 2004 lease agreement that Debtor obtained provided that he would rent approximately 551.1 acres beginning January 1, 2004, through December 31, 2004. The lease also provided that Debtor would have "the right to farm the land next year," but the Lessors have "the right to cancel agreement for nonpayment or for not following good management practices." <u>2004 Lease Agreement</u>, Exhibit D-8. That lease has never been cancelled by the Lessors. Instead, it was renewed in 2005 and in 2006. The 2006 Lease Agreement provided Debtor with approximately 547.1 acres of farm land. It commenced on January 1, 2006, and ended on December 31, 2006. Unlike the 2004 Lease Agreement, it provided the lease was for one year, but could "be renewed for the next year at the approval of the Lessors." <u>2006 Lease Agreement</u>, Exhibit D-12.

In late 2006, Loy, who was desirous of obtaining an additional 55 acres to farm, made a proposal to Debtor to take over an additional portion of Turf Farm, labeled as Tract D. <u>Proposal</u>, Exhibit D-14. His proposal was signed by Debtor and initialed by Carey on Loy's behalf on February 5, 2007. On the same day, Debtor delivered a check payable

to Carey in the amount of $9,348.00 for one-third of the rental cost of the farm. The written lease agreement was also circulated among the parties for execution. Carey negotiated the check, and it cleared the bank. Ralph and Julie each also received rent checks for their one-third interest in the land and later cashed the checks. Debtor entered possession of the property prior to the bankruptcy filing and has attempted to continue his farming operations.

As a result of Ralph's objection to Loy's acquisition of the additional 55 acres, the 2007 Lease Agreement apparently was torn up prior to the time that signed copies were distributed among the parties. Nevertheless, I found in previous proceedings that Debtor had effectuated a lease over Turf Farm, less the two 55 acre tracts that Loy had an interest in, by virtue of Carey's receipt and negotiation of the check (Exhibit D-16) and by Ralph and Julie's subsequent acceptance of similar checks delivered to them. Carey did not present any persuasive evidence at the recent hearing to alter this previous finding. *See* Order on Preliminary Injunction, Dckt. No. 10 (July 23, 2007); Interim Order on Motion to Assume Lease, Case No. 07-40427, Dckt. No. 190 (Sept. 21, 2007). Pursuant to the Interim Order to Assume the Lease, Debtor assumed the lease obligation as to Turf Farm with the exception of Tracts G, H, and D which were reserved for Loy.

Notwithstanding Carey's knowledge that Debtor had filed a Chapter 12, as evidenced by notices issued by this Court mailed to him and by his attendance at the § 341 meeting in April 2007, Carey subsequently entered upon Tract C, one of the tracts of land that was subject to lease, and began "harrowing up" land that had been prepared and bedded

for Debtor's intended planting of a peanut crop for 2007. Upon discovering Carey's activity, Debtor contacted his attorney, Lehman Franklin, who wrote a letter to Carey informing him that his activities constituted a violation of the automatic stay of bankruptcy and demanding that he cease any further activity.[1] *See* Exhibit D-17. Debtor and Ralph picked up the original of that letter at Mr. Franklin's office, drove to the Turf Farm, and discovered Carey in the act of harrowing Debtor's leased land. Carey initially ignored them, but ultimately Debtor physically delivered Franklin's letter to Carey, and Carey read the letter. Carey does not deny that he thereafter resumed harrowing the land thus rendering it unsuitable for planting the peanut crop.

Because of Carey's interference with Debtor's leasehold rights, Debtor was unwilling to risk planting a peanut crop on that tract or any of the other tracts within the Turf Farm, believing that to do so would risk destruction of the crop at Carey's hands. Carey

---

[1] The letter states:

> This firm represents Kurt Graham, individually, and Graham Forestry, Inc. in regards to Chapter 12 bankruptcy cases filed on March 22, 2007 in the United States Bankruptcy Court for the Southern Distrct of Georgia. It is my understanding that you are aware of these bankruptcy cases, as you in fact attended the 341 Meeting of Creditors.
>
> It has come to my attention that since the filing of these bankruptcy cases, you have been interfering with the farming operations being carried on your land pursuant to a lease agreement with Kurt Graham, and have actually damaged the fields that were prepared for planting.
>
> YOUR ACTIONS ARE IN VIOLATION OF THE AUTOMATIC STAY OF 11 U.S.C. § 362(a). I HEREBY DEMAND THAT YOU CEASE ALL ATTEMPTS TO INTERFERE WITH ANY AND ALL FARMING OPERATIONS OF KURT GRAHAM AND GRAHAM FORESTRY, INC. FAILURE TO DO SO WILL RESULT IN AN ADVERSARY PROCEEDING BEING FILED AGAINST YOU IN THE BANKRUPTCY COURT, IN WHICH WE WILL REQUEST DAMAGES, PENALTIES, AND ATTORNEY'S FEES.
>
> WE FURTHER DEMAND THAT YOU IMMEDIATELY REIMBURSE KURT GRAHAM IN THE AMOUNT OF $15.00/ACRE FOR THE DAMAGES YOU HAVE ALREADY CAUSED UP TO THIS DATE.

explains his activities by asserting that when Ralph tore up the 2007 Lease Agreement which granted the additional 55 acres to Loy, Carey believed that the lease with Debtor was terminated, and that Debtor had no rights in the property. Debtor brings this adversary proceeding seeking damages for Carey's willful violation of the automatic stay under 11 U.S.C. § 362(k), including the anticipated profit he believes would have been earned from a successful 2007 peanut crop.

## CONCLUSIONS OF LAW

### A. Carey Graham violated the automatic stay

Debtor's lease interest in Tract C of the Turf Farm is property of the estate under 11 U.S.C. § 541(a)(1). As stated in the Findings of Fact, Debtor had effectuated a lease over Farm Number 791 for 2007, less the two 55 acre tracts that Loy had an interest in, prior to Debtor's filing on March 22, 2007. Therefore, Debtor had a valid lease interest in the Turf Farm at the time of his Chapter 12 filing.

Section 541(a)(1) provides that an estate is created upon the commencement of a case and that such estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." The scope of this paragraph is broadly interpreted because "Congress intended a broad range of property . . . to be included in the estate." United States v. Whiting Pools, Inc., 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). "An unexpired lease is such an interest in property, and therefore qualifies as property of the estate." 410 Park Ave. Assoc., Corp. v. Am. Banknote Corp. (In re American

Banknote Corp.), slip op. 2000 WL 815910, at *2 (S.D.N.Y. June 22, 2000); *see also* In re Rickel Home Centers, Inc., 209 F.3d 291, 300 (3d Cir. 2000); In re Lucre, Inc., 339 B.R. 648, 653 (Bankr. W.D. Mich. 2006); In re Palace Quality Services Indus., Inc., 283 B.R. 868, 880 (Bankr. E. D. Mich. 2002); Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 138 B.R. 687, 700-01 (Bankr. S.D.N.Y. 1992).[2]

Furthermore, any crops grown on land which Debtor has leased is considered property of the estate. *See* Teel v. State, 7 Ga.App. 600, 67 S.E. 699 (Ga. Ct. App. 1910)("Where the relation of landlord and tenant exist, the title to crops grown on the rented land is the tenant, and not in the landlord.").

Section 362(a) states that the filing of a Chapter 12 petition "operates as a stay, applicable to all entities, of - (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . " 11 U.S.C. § 362(a)(3). All the landlords were well aware of Debtor's continued occupancy and use of their land, and "[u]ntil the automatic stay is terminated by an order for relief . . . , the debtor has a right to harvest crops on the land. This right is independent of the lease and any

---

[2] Legislative History of Code § 541 states:

The scope of the paragraph is broad. It includes all kinds of property including tangible and intangible property, causes of action. The debtor's interest in property also includes "title" to property which is an interest, just as are a possessory interest or leasehold interest for example . . .

H. Rep.No. 595, 95th Cong., 1st Sess. 367-68 (1977); S.Rep.No. 984, 95th Cong., 2d Sess. 82-83 (1978).

extrajudicial action taken by the landlords to terminate the debtors' rights or to secure the crop [or land] violated the automatic stay of 11 U.S.C. § 362(a)(3)." In re Nordyke, 43 B.R. 856, 864 (Bankr.Or. 1984).

### B. Carey Graham willfully violated the automatic stay

Section 362(k), formerly § 362(h) prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, authorizes damage awards for a violation of the automatic stay. Section 362(k)(1) provides that "an individual injured by any willful violation of the automatic stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).

Debtor "must demonstrate by a preponderance of the evidence that the violator had knowledge of the filing of the bankruptcy case." In re Davis, 374 B.R. 366, 369 (Bankr.S.D.Ga. 2007)(citing In re Robinson, 228 B.R. 75, 81 (Bankr.E.D.N.Y. 1998)). "Notice of the bankruptcy filing need not be formal or official to put a creditor on notice." In re Johnson, 501 F.3d 1163, 1172 (10th Cir. 2007). In the present case, Carey had notice of the bankruptcy filing at the time he attended the § 341 meeting. Therefore, at the time he harrowed Tract C of the Turf Farm, an event which occurred after he attended the § 341 meeting, Carey had knowledge of Debtor's bankruptcy filing.

Despite having knowledge of the bankruptcy, Carey argues that he did not

have the intent to violate the automatic stay since he did not believe at the time of the harrowing that Debtor had a valid lease. Even if true, this does not excuse his actions since a "willful" violation does not require specific intent to violate the automatic stay. In other words, the motivation of Carey in violating the automatic stay is not relevant to a determination of whether Carey's acts were "willful" or whether compensation must be awarded. In re Johnson, 501 F.3d at 1172; In re Lickman, 297 B.R. 162, 191 (Bankr.M.D.Fla. 2003); *see also* Brown v. Chesnut (In re Chesnut), 422 F.3d 298, 302 (5th Cir. 2005); Fleet Mortgage Group, Inc. v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999); In re Yates, 332 B.R. 1, 7 (10th Cir.B.A.P. 2005); In re Peralta, 317 B.R. 381, 389 (9th Cir.B.A.P. 2004); In re Risner, 317 B.R. 830, 835 (Bankr.D.Idaho 2004); In re Schafer, 315 B.R. 765, 774-75 (Bankr.D.Colo. 2004); In re San Angelo Pro Hockey Club, Inc., 292 B.R. 118, 125 (Bankr.N.D.Tex. 2003); *cf.* Jove Eng'g, Inc. v. I.R.S., 92 F.3d 1539, 1555-56 (11th Cir. 1996)("We have similarly stated [in regards to "willfullness"] that 'the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue.'").

Accordingly, when a creditor knows of the automatic stay, a willful violation occurs when that creditor intentionally performs the actions constituting the violation. In re Johnson, 501 F.3d at 1172; Fleet Mortgage Group, Inc., 196 F.3d at 269; Lansdale Family Rest., Inc. v. Weis Food Serv. (In re Lansdale Family Rest., Inc.), 977 F.2d 826, 829 (3d Cir. 1992). On April 25, 2007, Carey undisputably received notice of Debtor's bankruptcy.

Shortly thereafter, Carey harrowed Tract C, an action which at the hearing, he admitted that he intentionally performed for the purpose of obtaining land for Loy after Ralph tore up the lease. Moreover, he continued his actions even after Debtor and Ralph hand delivered a letter from Debtor's attorney advising him that his acts violated the stay and could result in actual and punitive damages.

Therefore, by a preponderance of the evidence, I conclude that Carey had knowledge of Debtor's pending bankruptcy and intentionally harrowed Tract C of the Turf Farm which Debtor had a valid lease interest over and intended to grow peanuts on. Under any reasonable interpretation of his acts, Carey willfully violated the automatic stay.

### C. Actual Damages

"In finding the Defendant's violation to be willful, this Court is required to award actual damages to Debtor, including his attorneys' fees and costs." In re Davis, 374 B.R. at 370 (*citing* 11 U.S.C. § 362(k)(1); In re Seal, 192 B.R. 442, 456 (Bankr.W.D.Mich. 1996)). As stated above, Debtor had a valid lease contract with Carey at the time Carey harrowed Tract C of the Turf Farm in May 2007. Generally, lost profits which can be traced solely to a breach of contract and are the immediate fruit of the contract are recoverable in an action for the breach. Aon Risk Serv., Inc., of Ga., v. Commercial Military Sys. Co., 270 Ga. App. 510, 607 S.E. 2d 157 (Ga. Ct. App. 2004), *cert. denied* Mar. 28, 2005; Signsation, Inc. v. Harper, 218 Ga. App. 141, 460 S.E. 2d 854 (Ga. Ct. App. 1995). A party who has been injured by a breach of contract can recover profits that would have resulted from

performance of the contract when their amount and the fact that they have been prevented by the breach can be proven with reasonable certainty. Authentic Architectural Millworks, Inc., v. SCM Group USA, Inc., 262 Ga. App. 826, 831, 586 S.E. 2d 726 (Ga. Ct. App. 2003); Comtrol, Inc., v. H-K Corp., 134 Ga. App. 349, 214 S.E. 2d 588 (Ga. Ct. App. 1975); Carter v. Greenville Serv. Co., 111 Ga. App. 651, 143 S.E. 2d 1 (Ga. Ct. App. 1965). In regards to tortuous conduct, "'[i]t may be stated as a general rule that in tort actions a recovery may be had for loss of profits, provided their loss is the proximate result of the defendant's wrong and they can be shown with reasonable certainty.'" Gipson v. Phillips, 232 Ga.App. 235, 236, 501 S.E.2d 570, 572 (Ga. Ct. App. 1998)(*quoting* Ga. Grain Growers Assn. v. Craven, 95 Ga.App. 741, 747, 98 S.E.2d 633 (1957)); MTW Inv. Co. v. Alcovy Prop., Inc., 228 Ga.App. 206, 207, 491 S.E.2d 460, 462 (Ga. Ct. App. 1997). Therefore, whether Carey's acts are viewed as a breach of contract or a tort, lost profits are recoverable.

To recover lost profits, Debtor must show the probable gain with great specificity, as well as expenses which would have been incurred in realizing such profits, as the measure of recovery is the gross amount of gain minus expenses. Authentic Architectural Millworks, Inc., 262 Ga. App. at 831; Grossberg v. Judson Gilmore Assoc., Inc., 196 Ga. App. 107, 109, 395 S.E. 2d 592, 594 (Ga. Ct. App. 1990). In recovering lost profits for tortuous conduct, the "mere difficulty in fixing the exact amount of the lost profits when this loss is proximately caused by the alleged injury does not constitute a legal obstacle to their recovery, provided that 'the amount of the recovery comes within that authorized with reasonable certainty by the legal evidence submitted.'" Gipson, 232 Ga.App. at 236, 501

S.E.2d at 572(*quoting* Johnston v. Lyon, 173 Ga.App. 524, 525, 327 S.E.2d 519 (Ga. Ct. App.1985)).

> The rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause rather than uncertainty as to the measure of extent of the damages. Mere difficulty in fixing their exact amount, where proximately flowing from the alleged injury, does not constitute a legal obstacle in the way of their allowance, when the amount of the recovery comes within that authorized with reasonable certainty by the legal evidence submitted."
>
> Ayers v. John B. Daniel Co., 35 Ga.App. 511, 512, 133 S.E. 878 (Ga. Ct. App. 1926).

Debtor's agricultural expert, Wendell Brannen, concluded that Debtor would have produced 110 acres of peanuts at 3700 pounds per acre which equals a total of 407,000 pounds or 203.50 tons.[3] He estimated that Debtor would have sold this peanut crop at an average price of $483.00 per ton, a price which would have yielded a gross revenue of $98,290.50. On the expense side, Mr. Brannen estimated Debtor would have incurred, per acre: $65.00 for seed, $24.60 for fertilizer, $10,00 for lime, $20.00 for landplaster (gypsum), $39.06 for herbicides, $19.30 for insecticide/nematicide, $78.00 for fungicides, $28.00 for

---

[3] This estimate falls in the mid-range of production by Debtor for the four prior crop years. Billy Dasher, an insurance agent, testified as to Debtor's peanut yield in 2003 through 2006. In 2003, Debtor planted 47.2 acres of irrigated peanuts and yielded 5,377 lbs of peanuts per acre. In 2004, Debtor planted 140.0 acres of irrigated Virginia peanuts, which are more difficult to grow than runner peanuts, and yielded 4,562 pounds of peanuts per acre. In 2005, Debtor planted 138.8 acres of irrigated peanuts and yielded 1,021 pounds of peanuts per acre. Mr. Dasher testified that he did not know why the yield was low but he did state that 2005 was not generally a bad year for peanut yields. Based on his experience, damage from wildlife like wild hogs, crop abandonment, and crop disease could all be causes for a low yield. In 2006, Debtor planted 71.6 acres of peanuts and yielded 691 pounds of peanuts per acre. Mr. Dasher did not know why Debtor's yield was low in 2006. *See* Exhibit D-29.

drying & cleaning, and $36.00 for machinery, for a total of $319.96 per acre. At $319.96 per acre, farming 110 acres would result in expenses of $35,195.60. After all adjustments, his testimony supported an award of $65,834.90 in actual damages.

However, Brannen did not estimate harvesting costs, labor, depreciation on certain equipment, and irrigation machinery/fuel/labor costs, since these costs vary from case to case. He conceded that these costs should be added to the costs of producing a peanut crop. In addition, he agreed that innoculant should be used when growing a peanut crop, a $5.00 per acre cost that was not included in the original calculation. Furthermore, Mr. Brannen testified there is a one percent national assessment fee on the gross sales of the peanut crop.

Debtor's second expert, Tom Kessler, an agricultural consultant, is familiar with the farming processes on this particular farm and testified that depreciation to equipment in bringing 110 acres of peanuts to harvest would be $30.00 to $40.00 per acre. Mr. Kessler also testified that the costs proposed by Mr. Brannen were fair and reasonable for peanut production on the Turf Farm.

Carey's expert, the county extension agent of Effingham County, relied on the University of Georgia Extension of Agricultural and Applied Economics report on peanuts grown on irrigated land in south Georgia in 2007. This report provided estimated costs and returns for an expected yield of 1.8 tons per acre. However, his testimony and the

figures he used were based on average cost estimates and are not as persuasive as Brannen's except those line items on which Brannen did not render an opinion. These average costs, according to the University of Georgia report, are labor at $28.15 per acre; fuel used in preharvest at $20.69 per acre; fuel for harvest at $23.16 per acre; and irrigation costs at $52.50 per acre.

I find that additional expenses on top of Mr. Brannen's proposed expense would be incurred as follows: $5.00 per acre for innoculant, $40.00 per acre for depreciation, $20.00 per acre for crop insurance, fuel expenses of $43.85 per acre and labor of $28.15 per acre. I find no evidence to support irrigation costs at less than the full amount estimated by the University of Georgia report even though 2007 enjoyed decent rainfall at critical times in the growing season. There was no evidence of Kurt's historic costs of irrigation in similar crop years to establish any other number than $52.50 per acre.

Based on these adjustments, I find that the reasonable cost of producing this crop would have been $509.46 per acre or $56,040.60, plus the one percent national assessment of gross revenue of $982.90 for total expenses of $57,023.50. The only other variable is whether Kurt would have sold his crop under a pre-planting delivery contract. Because Carey did not provide any persuasive evidence on this point, I find that the average price for 2007 peanuts of $483.00 per ton is reasonable. As a result, Kurt's lost profits total $41,267.00.

## D. Punitive Damages

Debtor also seeks to recover punitive damages from the Defendant. "Punitive damages are permitted for a willful violation of the automatic stay 'in appropriate circumstances.'" In re Davis, 374 B.R. at 372. "'Appropriate circumstances' include actions taken with malicious intent to harm and actions taken in arrogant defiance of federal law." Bishop v. U.S. Bank/Firstar Bank N.A. (In re Bishop), 296 B.R. 890, 898 (Bankr.S.D.Ga. 2003) (Davis, J.).

This court could evaluate the following factors in determining whether and in what amount punitive damages are warranted: (1) the degree of reprehensibility of violators conduct; (2) the ratio between the compensatory and punitive damages; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed for comparable conduct. Id. (*citing* Varela v. Ocasio (In re Ocasio), 272 B.R. 815, 825 (1st Cir.B.A.P. 2002)(applying guideposts set out in BMW of N.Am. v. Gore, 517 U.S. 559, 574-75, 116 S.Ct. 1589-98-99, 134 L.Ed.2d 809 (1996))). "Other courts, however have focused their analysis on the sufficiency of punitive damages to punish and deter wrongful conduct." In re Davis, 374 B.R. at 373. Despite the choice of analysis, "'the primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the [Defendant]'s behavior . . . " In re Bishop, 296 B.R. at 898 (*quoting* In re Ocasio, 272 B.R. at 825); *see* EEOC v. W&O, Inc., 213 F.3d 600, 614 (11th Cir. 2000)("[C]ourts should . . . consider whether the amount of punitive damages serves the interests of deterrence."(addressing punitive damages in the context of 42 U.S.C. § 1981 violation).

In this case, an award of damages in a significant amount is called for in order to fulfill the purposes of such awards. Carey knew Debtor had filed a Chapter 12 case since he had attended the creditors' meeting. He knew Debtor claimed a leasehold interest in the Turf Farm. Though Carey personally disputed the validity of the lease, he knew it was an open question. Despite that knowledge, in flagrant disregard of the mandates of federal law, he took it upon himself to act in violation of Debtor's rights. Of course, if it was later determined that Carey was correct about the lease, he might not have become liable for his actions. But he was not correct. He took matters into his own hands and harrowed the field leased to Debtor and damaged it for Debtor's intended use. To make matters worse, when Carey was handed the letter from Kurt's counsel by Debtor advising him of his potential liability, he did not cease, as any reasonable person would. Instead, he continued harrowing the field, making it clear to Debtor that it would be foolhardy to make any further efforts to farm that field. That cost Debtor the potential income from what was a good peanut crop in this area in 2007. It also demonstrates that Carey cannot be relied on to follow the law by the mere imposition of actual damages and attorney's fees. He will only change his behavior if punitive damages are awarded.

However, because such damages must be set at a level sufficient to punish and deter wrongful conduct, that amount must be considered in the context of the entire award, including attorney's fees which may be substantial. Because that determination was deferred until a later hearing date, the amount of the punitive damages award will be reserved until the hearing to set the amount of attorney's fees.

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that Debtor is awarded actual damages in the amount of $41,267.00, plus attorney's fees and punitive damages in an amount to be determined at a hearing assigned for

> Friday, February 20, 2009
> at 10:00 o'clock a.m.
> Bankruptcy Courtroom, Second Floor
> United States Courthouse
> Savannah, Georgia

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 23rd day of January, 2009.